**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Pierce Division**

**Case No. 2:21mc14073-MARTINEZ-MAYNARD**

Case Pending in the U.S. District Court for the Northern District of California:
*Sweet, et al. v. Zais [Rosenfeldt], et al.*, 3:19-cv-03674-WHA (N.D. Cal.)

IN RE SUBPOENA SERVED ON ELISABETH DEVOS

<u>**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO QUASH**</u>
<u>**THE RULE 45 SUBPOENA OF ELISABETH DEVOS**</u>

Manuel J. Dominguez
FL Bar No.: 0054798
Email:  jdominguez@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL
PLLC
11780 U.S. Highway One | Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
Facsimile:  (561) 515-1401

Margaret E. O'Grady *(pro hac vice)*
Email: mogrady@law.harvard.edu
Rebecca C. Ellis (*pro hac vice*)
Email: rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

## TABLE OF CONTENTS

Notice Regarding Motion to Transfer……………………………………………………vii

I. Introduction…………………………………………………………………………..1

II. Factual Background………………………………………………………………1

   A.  The *Sweet v. DeVos* Litigation……………………………………………………1

   B.  The Discovery Period………………………………………………………………4

   C.  The DeVos Subpoena………………………………………………………………5

III. Argument………………………………………………………………………..7

   A.  The "Apex" Doctrine—Even if it Applies—Does Not Preclude the
      Deposition of Former Secretary DeVos…………………………………………...7

     1.  The Policy Reasons the Apex Doctrine Should Not Apply to Former
        Officials Are Especially Applicable Here ………………………………………8

     2.  In Any Case, Extraordinary Circumstances Justifying Ms. DeVos's
        Deposition are Present……………………………………………………………10

       a.  Ms. DeVos Has Unique Firsthand Knowledge About the Actual
          Reason for the Delay in Issuing Borrower Defense Applications………….11

         i.   The Reasons for the Delay Order………………………………………12

         ii.  The *Calvillo Manriquez* Injunction Excuse……………………………13

         iii. The "Chilling Effect" Excuse………………………………………16

         iv. The Staffing Excuse……………………………………………………18

         v. The False Restart………………………………………………...........19

       b.  This Information Is Not Available From Other Sources………...............20

   B.  Ms. DeVos Improperly Maligns Plaintiffs' Motives…………………….............24

IV. Conclusion………………………………………………………………………25

# TABLE OF AUTHORITIES

*Alexander v. FBI*, 186 F.R.D. 1 (D.D.C. 1998) .......................................................... 23

*Am. Broad. Cos., Inc. v. U.S. Information Agency*, 599 F.Supp. 765 (D.D.C. 1984).................. 10

*Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 175 F.R.D. 347 (N.D. Ga. 1997)......... 10

*Bagley v. Blagojevich,* 486 F.Supp.2d 786, 789-90 (C.D. Ill. 2007) ........................................... 10

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)). ............................................ 9

*Coleman v. Schwarzenegger*, Nos. CIV S-90-0520, C01-1351, 2008 WL 4300437 (E.D.
  Cal./N.D. Cal. Sept. 15, 2008) ............................................................................................... 9

*Consumer Fin. Prot. Bureau v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 1:17CV817, 2017
  WL 6042221 (N.D. Ohio Dec. 6, 2017) ................................................................................ 7

*Cruz v. Green,* No. 18-60995-CIV, 2019 WL 5208913 (S.D. Fla. Feb. 7, 2019), ...................... 22

*Dep't of Commerce v. New York*, 139 S.Ct. 2551 (U.S. 2019)................................................. 9, 25

*Detoy v. City & Cnty. of San Francisco*, 196 F.R.D. 362 (N.D. Cal. 2000)................................ 10

*Energy Capital Corp. v. United States*, 60 Fed. Cl. 315, 318 (Fed. Cl. 2004) .................. 8, 11, 12

*Eng v. County of Los Angeles*, No. CV 05-2686 MMM (SSx)2007 WL 9729101 (C.D. Cal. Apr.
  5, 2007) .......................................................................................................................... 21, 22

*Fair Fight Action, Inc. v. Raffensberger*, 333 F.R.D. 689 (N.D. Ga. 2019)................................ 11

*Fla. Office of Ins. Regulation v. Fla. Dep't of Fin. Servs.*, 159 So. 3d 945 (Fla. Dist. Ct. App.
  2015) ............................................................................................................................... 7, 12

*Gibson v. Carmody*, No. 89 Civ. 5358 (LMM), 1991 WL 161087 (S.D.N.Y. Aug. 14, 1991).... 11

*Givens v. Newsom*, No. 20–cv–0852–JAM–CKD, 2021 WL 65878  (E.D. Cal. Jan. 7, 2021)...... 8

*Gray v. Kohl*, No. 07-10024-CIV, 2008 WL 1803643, at *1 (S.D. Fla. Apr. 21, 2008) ............. 11

*Greater Birmingham Ministries v. Merrill*, 321 F.R.D. 406, 409 (N.D. Ala. 2017) ............... 7, 23

*In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993)............................................. 10

*In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-01570 (GBD)(SN), 2020 U.S. Dist.

LEXIS 166886, at *272 (S.D.N.Y Aug. 27, 2020) ................................................................. 11

*In re United States*, 542 F. App'x 944, 947 (Fed. Cir. 2013). ........................................................ 8

*Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-CV-246-CWR-FKB, 2018 WL 3543955 (S.D. Miss. July 20, 2018), ...................................................................................................... 21, 23

*Karnoski v. Trump*, No. C17-1297 MJP, 2020 WL 5231313 (W.D. Wash. Sept. 2, 2020) ......... 12

*Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) ............. 5, 12

*Lull v. County of Sacramento*, No. 2:18-cv-1020-MCE-EFB PS, 2020 WL 4547166 (E.D. Cal. Aug. 6, 2020) ..................................................................................................................... 10, 22

*McDonell Douglas Corp. v. United States*, 35 Fed.Cl. 358 (Fed. Cl. 1996) ................................ 11

*Moriah v. Bank of China Ltd.*, 72 F.Supp.3d 437 (S.D.N.Y. 2014) ............................................ 11

*Odom v. Roberts*, No. 5:19-cv-253-MCR/MJF, 2020 WL 7111175 (N.D. Fla. Dec. 1, 2020) ... 21, 23

*Panagoulakos v. Yazzie*, No. CIV 11-381 KBM/WDS, 2012 WL 13076527 (D.N.M. Apr. 13, 2012) ............................................................................................................................................ 18

*Reilly v. Chipotle Mexican Grill, Inc.,* No. 15-civ-23425-COOKE/TORRES, 2016 WL 10644064 (S.D. Fla. Sept. 26, 2016). .................................................................................................... 20, 23

*Sanstrom v. Rosa*, No. 93 Civ. 7146 (RLC), 1996 WL 469589 (S.D.N.Y. Aug. 6, 1996) ........... 11

*Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F.Supp. 3d 199 (S.D.N.Y. 2015) ............................................................................................... 11

*St. Fleur v. City of Linden, New Jersey*, No. 15CV01464SRCCLW, 2017 WL 3448106 (D.N.J. Aug. 10, 2017) ............................................................................................................................ 22

*Smith v. City of Stockton*, 2017 WL 11435161 (E.D. Cal. Mar. 27, 2017) ................................... 12

*Starr Int'l Co. v. United States*, 121 Fed.Cl. 428, 431 (Fed. Cl. 2015) ........................................ 11

*Summerville v. N.J. State Police,* No. 14-7653 (KM), 2018 WL 401785 (D.N.J. Jan. 11, 2018) 22

*Telecomms. Research and Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984). .................... 13

*Toussie v. County of Suffolk*, No. CV 05-1814(JS)(ARL), 2006 WL 1982687 (E.D.N.Y. July 13, 2006) .................................................................................................................................... 7, 11

*Union Sav. Bank of Patchogue, New York v. Saxon*, 209 F. Supp. 319 (D.D.C 1962)................ 20

*United States v. Morgan*, 313 U.S. 409 (1941),........................................................................ 9

*United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 326 (D.N.J. 2009)..................... 8, 11

*Virgo Corp. v. Paiewonsky*, 39 F.R.D. 9, 10 (D.V.I. 1966)......................................... 11

**EXHIBIT LIST**

| Exhibit | Document |
|---|---|
| A | Order Denying Class Settlement, to Resume Discovery, and to Show Cause at 15 ("Discovery Order"), *Sweet* Matter, ECF No. 146 |
| B | Order Re Discovery Letter and Related Matters ("DeVos Order"), *Sweet* Matter, ECF No. 172 |
| C | Discovery Letter Brief re: Deposition of Former Secretary DeVos ("DeVos Letter"), *Sweet* Matter, ECF No. 171 |
| D | Excerpts from the Dec. 15, 2020 Deposition of Mark A. Brown |
| E | Excerpts from Dec. 9, 2020 Deposition of Colleen M. Nevin |
| F | Excerpts from the Dec. 17, 2020 Deposition of James Manning |
| G | Excerpts from the Nov. 20, 2020 Deposition of Diane Jones |
| H | DeVos Written Testimony before the House Committee on Education and Labor at 6 (Dec. 12, 2019), https://edlabor.house.gov/imo/media/doc/SecretaryDeVosTestimony121219.pdf ("HERC Testimony") |

## NOTICE REGARDING MOTION TO TRANSFER

On February 8, 2021, Elisabeth DeVos filed her Motion to Quash Rule the 45 Deposition Subpoena (ECF No. 1) ("Motion to Quash") in this matter. On February 11, 2021, Theresa Sweet, Chenelle Archibald, Daniel Deegan, Samuel Hood, Tresa Apodaca, Alicia Davis, and Jessica Jacobson, representatives of the class certified in the underlying action, *Sweet, et al. v. Zais, et al.*, 3:19-cv-03674-WHA (N.D. Cal.) (the "*Sweet* Matter"), moved this Court (ECF No. 12) pursuant to Rule 45(f) of the Federal Rules of Civil Procedure to transfer the Motion to Quash to the Northern District of California, to be heard by Judge William Alsup in the *Sweet* matter. On February 17, 2021, this Court ordered counsel for Ms. DeVos to file an expedited response to the *Sweet* Plaintiffs' motion (ECF No. 13). Responses were filed Friday, February 19 and today, February 22, 2021 (ECF Nos. 18 and 19). The Court has not yet ruled on the Plaintiffs' Motion to Transfer.

In accordance with this Court's Local Rule 7.1(c)(1), Plaintiffs hereby file their Opposition to the Motion to Quash. In so doing, Plaintiffs do not concede that the Southern District of Florida is the proper venue for the Motion to Quash, and reserve and maintain all arguments made in their Motion to Transfer.

## I.    INTRODUCTION

Elisabeth DeVos's Motion to Quash the Rule 45 Deposition Subpoena should be denied. Ms. DeVos has unique, firsthand knowledge of issues at the heart of the underlying litigation, which discovery has shown is unavailable from other sources. Because Ms. DeVos is the *former* Secretary of Education, the court need not even take into consideration the policy concerns that generally necessitate a showing of "extraordinary circumstances" to depose a high-ranking government official.  But, in any case, it is clear that Ms. DeVos's testimony is necessary to fully understand the issue at the heart of the *Sweet* Matter: The Department of Education ("ED")'s delay in processing tens of thousands of borrower defense applications.

The California court ordered discovery because of a "strong showing of agency pretext" and the need to determine "what is really going on." Order Denying Class Settlement, to Resume Discovery, and to Show Cause at 15 ("Discovery Order," attached as Ex. A), *Sweet* Matter, ECF No. 146. Four depositions of ED officials and written discovery have not been able to answer the key question: why did ED stop issuing borrower defense decisions? As such, as Judge Alsup foresaw when he stated that "class counsel may not *yet* depose the Secretary", but "[e]xtraordinary circumstances . . . may justify such a deposition at a later date." *Id.* at 16. (emphasis added), Ms. DeVos's testimony is necessary.

## II.    FACTUAL BACKGROUND

### A.    The *Sweet v. DeVos* Litigation

On June 25, 2019, the *Sweet* Plaintiffs filed a complaint against ED and its then-Secretary, Ms. DeVos (together, the "*Sweet* Defendants" or "Defendants") in the Northern District of California, alleging that the *Sweet* Defendants had violated Section 706 of the Administrative Procedure Act (APA) by unlawfully withholding or unreasonably delaying action on the *Sweet*

Plaintiffs' applications for borrower defense to repayment of their student loans. *See* Complaint, *Sweet* Matter, ECF No. 1; Discovery Order at 4. Borrower defense to repayment is a process by which individuals who have borrowed federal student loans can apply for those loans to be cancelled on the basis of their school's misconduct. *See generally* Complaint ¶¶ 1, 52-76. At the time the Complaint was filed, ED had not issued a single decision on any borrower defense application for over a year. *See id.* ¶¶ 6-8, 181-182. This complete halt to the borrower defense process followed a period of deliberate slow-down, in which ED reduced staff and resources for its Borrower Defense Unit and instituted other stop-work orders. *See id.* ¶¶ 149-180.

The California court certified a nationwide class of approximately 160,000 federal student loan borrowers in October 2019. *See* Discovery Order at 4. ED certified an administrative record soon thereafter, and the parties cross-moved for summary judgment. *Id.* But before the court ruled on those motions, the parties entered into a settlement agreement. The agreement provided, *inter alia*, that ED would resolve all pending borrower defense applications within 18 months (with reporting requirements and penalties to ensure compliance), and that the litigation would be resolved without "prejudice [to] the merits of borrowers' applications." *Id.* at 5. The court granted preliminary approval of the settlement on May 22, 2020. *See* Order Granting Motion for Preliminary Settlement Approval, *Sweet* Matter, ECF No. 103.

"Then came the snag." Discovery Order at 5. Counsel for Plaintiffs discovered that, both before and since the settlement agreement had been signed, ED had been issuing "alarmingly curt" pro forma denial notices to tens of thousands of class members, contrary to what was required by the settlement agreement and the APA. *Id.* Plaintiffs sought an order from the court that ED had breached the settlement agreement, even before final approval had been granted. *See id.* at 5-6. The court requested further information from ED, and in response, ED admitted that it had been

using form denial notices to deny over 118,000 applications (an 89.8% denial rate). *Id.* at 5.

On October 1, 2020, the court held a fairness hearing on the proposed settlement agreement over Zoom. Hundreds of student loan borrowers attended, and the court pre-selected fourteen representatives to speak on behalf of the class. These borrowers all spoke about their "serious concern with the proposed settlement, particularly in light of the Secretary's recent string of form denials." Discovery Order at 6. "In both written letters to the court and in the Zoom chat at the October 1 fairness hearing, many borrowers reported receiving almost identical denial notices." *Id.* at 8. As the court heard, members of the class "live under the severe financial burden of their loans," and the "form denial[s] put[] borrowers in worse positions than they started." *Id.* at 15. The court was "struck by the scope of the problem" and "the class's shared trauma," noting further that "[t]his is not an attorney-driven case. Class members have a genuine interest; they sought opportunity via higher education only to be to be deceived by for-profit institutions and, at least in some cases, saddled with crushing debt." *Id.* at 16-17.

On October 19, 2020, the California court denied final approval of the settlement agreement because of the dispute as to what a "final decision" on a borrower defense application required. *Id.* at 10. Going further, the court explained that, "[f]or eighteen months, the Secretary refused" to issue decisions on any borrower defense applications,

> "largely on the grounds that such answers required backbreaking effort and, thus, substantial time. Now, the Secretary has begun issuing decisions at breakneck speed. But most are a perfunctory 'Insufficient Evidence' — without explanation."

*Id.* at 6. The court found that the then-Secretary's actions were "cause for alarm," *id.* at 7, because:

> "[b]orrowers cannot possibly understand why their applications have been denied. They do not believe the Secretary has reviewed their borrower-defense applications in ***good faith*** and do not know, realistically, how to proceed. It's no wonder borrowers are confused. The Secretary's perfunctory denial notice does not explain the evidence reviewed or the law applied. It provides no analysis. And, the borrower's path forward rings ***disturbingly Kafkaesque***."

*Id.* at 8 (emphasis added). The court concluded that "[q]uestions of legality plague the Secretary's new perfunctory denial notice, and the circumstances of its use appear to contradict one of the primary justifications for her original delay." *Id.* at 11.

Accordingly, the California court opened an expedited two-month discovery period, to create "an updated record and updated discovery to determine what is going on." *Id.* Plaintiffs could "take both written discovery and up to five fact depositions of relevant decision-makers to inquire into, broadly," three topics relating to ED's actions with respect to borrower defense applications. Those topics were, briefly, "[t]he development and use of the form denial letters"; "[t]he extent to which the difficulty of reviewing borrower-defense applications actually caused or justified the Secretary's eighteen-month delay"; and "[t]he extent to which the Secretary has denied applications of students who have attended schools subject to findings of misconduct." *Id.* at 16.[1]

## B.  The Discovery Period

During the expedited discovery period, Plaintiffs took four depositions of current and former ED officials who, purportedly, were responsible for developing and applying borrower defense policy: Diane Auer Jones, then the Principal Deputy Under Secretary delegated to perform the duties of Under Secretary at ED (Nov. 20, 2020); Colleen Nevin, the Director of the Borrower Defense Unit at ED's Federal Student Aid division (FSA) (Dec. 9, 2020); Mark Brown, the Chief Operating Officer of FSA (Dec. 15, 2020); and James Manning, the former Acting Under Secretary

---

[1] The court also ordered the *Sweet* Defendants to show cause why they should not be preliminarily enjoined from issuing any further denial notices to class members while the Sweet litigation was pending. Discovery Order at 17. In response, the *Sweet* Defendants agreed to cease issuing denials to class members and hold all class members' loans in forbearance during the pendency of the case. Defendants' Response to October 19, 2020 Order to Show Cause at 2-3, *Sweet* Matter, ECF No. 150.

of Education and former Acting Chief Operating Officer of FSA (Dec. 17, 2020).[2]

Taken together, these four deponents represent senior leadership in borrower defense operations during the time period relevant to Complaint (January 2017 through the present). Yet each consistently disclaimed responsibility for or personal knowledge of two out of the court's three discovery topics: the actual reasons for ED's delay of borrower defense decisions, and the policy behind using form denial letters to deny tens of thousands of borrower defense claims. Although the *Sweet* Defendants have admitted in effect that *somebody* told FSA to stop issuing borrower defense decisions from June 2018 through December 2019,[3] none of the deponents were willing or able to identify the person who issued that directive or to explain the actual reasoning behind the stoppage. *See infra* §§ III(A)(2)(a)(i-iv).

Meanwhile, Plaintiffs also took written discovery and issued requests for the production of documents. In total, the *Sweet* Defendants produced approximately 2,500 documents, which did not include *any* internal ED communications about the very question that discovery was meant to answer: why ED ceased deciding borrower defense applications.[4]

### C. The DeVos Subpoena

In its Discovery Order, the California court stated that "class counsel may not **yet** depose the Secretary" (emphasis added), but noted that "[e]xtraordinary circumstances, however — for example, if the Secretary has unique first-hand knowledge or necessary information cannot be

---

[2] The Brown, Jones, Manning, and Nevin deposition excerpts are attached as Exhibits D-G, respectively.

[3] *See, e.g.,* Declaration of Colleen Nevin ¶ 65, *Sweet* Matter, ECF No. 56-4.

[4] Plaintiffs have moved to compel the production of documents sufficient to show any direction given to the Borrower Defense Unit to stop and/or resume adjudicating, submitting for approval, and/or developing memoranda on borrower defense claims, along with certain other discrete categories of documents. *See* Letter Motion to Compel, *Sweet* Matter, ECF No. 176. Defendants have maintained that Plaintiffs are entitled to no such documents. Those disputes are set for hearing before Judge Alsup on February 24, 2021.

obtained through other, less intrusive means — may justify such a deposition at a later date."

Discovery Order at 16 (citing *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203

(2d Cir. 2013)). The court ordered the Plaintiffs to file a letter brief if they sought to expand or

extend discovery. *See id.*

After pursuing four of the five permitted depositions, and negotiating an extension to the

discovery schedule to facilitate ED's ability to search for and produce responsive documents and

investigate and respond to Plaintiffs' interrogatories, on January 6, 2021, counsel for the *Sweet*

Plaintiffs informed counsel for the *Sweet* Defendants that they would be filing a letter brief with

the court to request leave to depose then-Secretary DeVos.  Ms. DeVos abruptly resigned as

Secretary of Education the next day, on January 7, 2021. The *Sweet* Plaintiffs sought the court's

leave to depose Ms. DeVos because discovery to date had made it clear that, as the senior-most

policy-setting individual at the agency during the relevant time period, Ms. DeVos had "unique

first-hand knowledge or necessary information" that could not be — because it had not been —

obtained through other, less intrusive means. *See* Discovery Letter Brief re: Deposition of Former

Secretary DeVos at 1 ("DeVos Letter," attached as Exhibit C), *Sweet* Matter, ECF No. 171.

On January 12, 2021, the court issued a brief order in response:

"The Court appreciates class counsel's request to depose Elisabeth DeVos, but the prior order restricted deposition of '*the Secretary*'…It imposed no such restriction regarding Citizen DeVos. Now, given her new status, if counsel pursues such deposition, it must subpoena Ms. DeVos."

Order Re Discovery Letter and Related Matters ("DeVos Order") (attached hereto as Ex. B), *Sweet*

Matter, ECF No. 172. Accordingly, on January 13, 2021, Plaintiffs' counsel emailed counsel for

the *Sweet* Defendants to inquire whether they would accept service of a subpoena on behalf of Ms.

DeVos. After a series of emails, which set the stage for the current dispute over the proper venue

for the Motion Quash, *see* Motion to Transfer at 7 (ECF No. 12), counsel agreed to accept service,

and Plaintiffs served their deposition subpoena for Ms. DeVos on January 26, 2021. *See* ECF No.

1-1 (stating, as counsel had requested, that the place of compliance would be "via remote technology, with witness located in Vero Beach, Florida").

## III.    ARGUMENT

### A.    The "Apex" Doctrine—Even If It Applies—Does Not Preclude the Deposition of Former Secretary DeVos.

Under what is commonly referred to as the "apex" doctrine, "[a] party seeking to depose a ... high-ranking governmental official must demonstrate the personal involvement of the official in a material way or the existence of extraordinary circumstances." *Fla. Office of Ins. Regulation v. Fla. Dep't of Fin. Servs.*, 159 So. 3d 945, 950 (Fla. Dist. Ct. App. 2015) (quotation and citation omitted); *see generally United States v. Morgan*, 313 U.S. 409 (1941); *but see Greater Birmingham Ministries v. Merrill*, 321 F.R.D. 406, 409 (N.D. Ala. 2017) ("There is no *per se* rule forbidding deposing high government officials" within the Eleventh Circuit).

Courts are divided on the question of whether the apex doctrine applies to *former* high-ranking government officials. ***Compare, e.g.,*** *Sanstrom v. Rosa*, No. 93 CIV. 7146 (RLC), 1996 WL 469589, at *5 (S.D.N.Y. Aug. 16, 1996) ("It is true that when the witness sought to be deposed is a high-level government official, a party must show both the need for the deposition and that it will not hinder governmental functions. However, because Mr. Cuomo is no longer governor, he cannot claim this privilege.") (internal citation omitted), ***and*** *Toussie v. Cty. of Suffolk*, No. CV 05-1814(JS)(ARL), 2006 WL 1982687, at *2 (E.D.N.Y. July 13, 2006) (ordering deposition of former County Executive because "[t]he specific rules governing depositions of high level government officials d[id] not apply to" him after he left office), ***and*** *Consumer Fin. Prot. Bureau v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 1:17CV817, 2017 WL 6042221, at *1 (N.D. Ohio Dec. 6, 2017) (ordering deposition of former director of Consumer Financial Protection Bureau because he "is no longer a high-level government official" (internal quotation marks omitted)),

*with* *Energy Capital Corp. v. United States*, 60 Fed. Cl. 315, 318 (2004) (applying apex doctrine and ordering deposition of former Housing and Urban Development Secretary and General Counsel) *and Cruz v. Green,* No. 18-60995-CIV, 2019 WL 5208913 (S.D. Fla. Feb. 7, 2019).[5] The only Court of Appeals to have discussed the applicability of the apex doctrine to former officials is the Federal Circuit in *In re United States*, 542 F. App'x 944, 947 (Fed. Cir. 2013). There, though the court blocked the deposition of the Chairman of the Federal Reserve Board to avoid disrupting significant ongoing government activities, the Federal Circuit suggested that the trial court consider "postponing" the deposition of the Chairman "***until after he leaves his post***." *Id.* at 949 (emphasis added).  The clear implication is that the apex doctrine does not apply, or applies with less force, to former high-ranking government officials. *Accord Givens v. Newsom*, No. 20–cv–0852–JAM–CKD, 2021 WL 65878, at *6 (E.D. Cal. Jan. 7, 2021) ("Several of the [apex] doctrine's rationales apply with less force when the proposed deponent is not currently serving in office."); *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 326 (D.N.J. 2009) ("No deposition will ***ever interfere*** with the duties of a former high-ranking government official because the official is no longer in office.") (emphasis added).

      **1.**      **The Policy Reasons the Apex Doctrine Should Not Apply to Former Officials Are Especially Applicable Here.**

As her private counsel stated in its Opposition to the *Sweet* Plaintiffs' Motion to Transfer before this Court, "Betsy DeVos is a private citizen." ECF No. 19 at 1 (Feb. 22, 2021); *see also* DeVos Order (referring to the former Secretary as "Citizen DeVos.").  First, allowing Ms. DeVos to be deposed will not discourage honest public service. The reason the *Sweet* Plaintiffs are even

---

[5] Ms. DeVos's Motion to Quash cites to *City of Fort Lauderdale v. Scott*, No. 10-61122-CIV, 2012 WL 760743, at *2 (S.D. Fla. Mar. 7, 2012) (Motion to Quash at 12), but there, the prospective deponent was *also* a *currently* serving official.

in a position to seek her deposition is that a court has found evidence of agency pretext. Discovery Order at 15. If government officials "acted with improper motive or acted outside the scope of [their] official capacity," the government's interest in shielding those actions from discovery is— and ought to be—diminished. *Coleman v. Schwarzenegger*, Nos. CIV S-90-0520, C01-1351, 2008 WL 4300437, at *3 (E.D. Cal./N.D. Cal. Sept. 15, 2008). As such, Ms. DeVos's concerns about "chilling" decision-making are unavailing.[6] And, of course, the testimony of decision-makers can be required under the APA, even absent any implication of improper motive. *Cf. Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2573-74 (U.S. 2019) (recognizing "a narrow exception to the general rule against inquiring into 'the mental processes of administrative decision[-]makers' . . . [o]n a 'strong showing of bad faith or improper behavior'" (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

For her separation of powers argument, Ms. DeVos relies on *United States v. Morgan*, which noted that "'it was not the function of the court to probe the mental processes of the Secretary.'" 313 U.S. 409, 422 (1941) (internal quotation omitted). But Plaintiffs are not seeking thoughts and mental processes concerning Ms. DeVos's discretion, which in any event would be shielded by privilege. Rather, Plaintiffs are seeking the testimony of Ms. DeVos to understand the explanation for agency inaction, because the previous deponents have provided only pretextual, verifiably false explanations for agency inaction. *See* Discovery Order at 16; *infra* § III(A)(2)(a).

And, of course, Ms. DeVos was the Secretary of Education—and thus the named defendant in the case—since the Complaint was filed until her abrupt resignation, which came the day after

---

[6] Further, history demonstrates that permitting deposition of a high-level official has not prevented that official from later seeking elected office. *See, e.g.,* Andrew Cuomo after *Energy Capital*, 60 Fed.Cl. at 318 (allowing videotaped deposition of former HUD Secretary Andrew Cuomo, now Governor of New York.)

counsel for the *Sweet* Plaintiffs notified counsel for the *Sweet* Defendants that they would be seeking her testimony.  Ms. DeVos claims that she is protected by a doctrine necessary to ensure the day-to-day functioning of the executive branch in the face of endless requests for testimony (Motion to Quash at 12), but her deposition at this point will interfere with zero governmental duties, as she is no longer performing them.  Ms. DeVos also suggests that *she* should not be deposed because *other* hypothetical private citizens might be discouraged from public service in the future.  *Id.* at 12-13. This is highly unlikely in this case given that the deposition topics have been set forth by the California court's Discovery Order, and a clear showing has been made that Ms. DeVos has unique knowledge about the specific topics concerning borrower defense at issue.

> **2.**     **In Any Case, Extraordinary Circumstances Justifying Ms. DeVos's Deposition Are Present.**

Indeed, even if the Court chooses to apply the apex doctrine, former Secretary DeVos's deposition is permissible because "extraordinary circumstances" are present: she "has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means." *Karnoski v. Trump,* 2020 WL 5231313, at *4 (W.D. Wash. Sept. 2, 2020).

Extraordinary circumstances have been regularly found to open the doors to the depositions of *current* (and former) federal, state, territorial, and local officials. *See, e.g.*, *Lull v. County of Sacramento*, No. 2:18-cv-1020-MCE-EFB PS, 2020 WL 4547166, at *2 (E.D. Cal. Aug. 6, 2020) (allowing deposition of the Sacramento County Director of Finance), *Bagley v. Blagojevich,* 486 F.Supp.2d 786, 789-90 (C.D. Ill. 2007) (allowing deposition of Illinois Governor), *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 175 F.R.D. 347, 348 (N.D. Ga. 1997) (allowing deposition of Mayor of Atlanta), *Detoy v. City & Cnty. of San Francisco*, 196 F.R.D. 362, 370 (N.D. Cal. 2000) (allowing deposition of San Francisco Police Chief), *Am. Broad. Cos., Inc. v.*

*U.S. Information Agency*, 599 F. Supp. 765, 769-70 (D.D.C. 1984) (allowing deposition of United States Information Agency Director), *Virgo Corp. v. Paiewonsky*, 39 F.R.D. 9, 10 (D.V.I. 1966) (allowing deposition of Governor of the Virgin Islands).[7]  For the reasons explained below, such circumstances clearly apply here.

> **a. Ms. DeVos Has Unique First-Hand Knowledge About the Actual Reason for the Delay in Issuing Borrower Defense Applications.**

The California court ordered discovery beyond the administrative record in the *Sweet* litigation because there had been a "strong showing of agency pretext," and the court needed to determine "what is really going on." Discovery Order at 15. Discovery to date has revealed that

---

[7] Indeed, Ms. DeVos outright ignores the myriad cases where former officials have been deposed. *See Energy Capital*, 60 Fed.Cl. at 318 (allowing videotaped deposition of former HUD Secretary and former HUD General Counsel upon finding of relevant "first-hand personal knowledge that no one else has"); *see also Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F.Supp. 199, 252 (S.D.N.Y. 2015) ("Given that Sutter has resigned from his position on the Subcommittee, he no longer has government duties with which a deposition might interfere.") *Moriah v. Bank of China Ltd.*, 72 F.Supp.3d 437, 440 (S.D.N.Y. 2014) ("Although the [apex] doctrine applies to former officials, the fact that they are not current high-ranking officials is a factor when considering whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's government duties."); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-01570 (GBD)(SN), 2020 U.S. Dist. LEXIS 166886, at *272 (S.D.N.Y Aug. 27, 2020) (accord); *Fair Fight Action, Inc. v. Raffensberger*, 333 F.R.D. 689, 698 (N.D. Ga. 2019) (allowing deposition of sitting Georgia Governor concerning actions as former Secretary of State); *Sensient Colors*, 649 F.Supp.2d at 327 ( (allowing deposition of former EPA Regional Administrator), *Toussie*, 2006 WL 1982687, at *2 (allowing deposition of former Suffolk County Executive because plaintiffs alleged he directly interfered with their ability to purchase property by directing a subordinate to stop doing business with them and he accordingly "may possess particular information necessary to the development of the plaintiffs' case"), *Sanstrom*, 1996 WL 469589, at *8 (compelling deposition of former New York Governor), *Gibson v. Carmody*, No. 89 Civ. 5358 (LMM), 1991 WL 161087, at *1 (S.D.N.Y. Aug. 14, 1991) (permitting deposition of former New York City Police Commissioner upon showing of personal involvement in proceedings relevant to the case); *Starr Int'l Co. v. United States*, 121 Fed.Cl. 428, 431 (Fed. Cl. 2015) (Former Treasury Secretary Henry Paulson, former Chairman of the Federal Reserve Ben Bernanke, and Former Treasury Secretary and President of the Federal Reserve Bank of New York Timothy Geithner testified), *vacated in part on other grounds*, 856 F.3d 953 (Fed. Cir. 2017); *McDonell Douglas Corp. v. U.S.*, 35 Fed.Cl. 358, 372 (Fed. Cl. 1996) (stating former Defense Se'y Dick Cheney testified at trial), *reversed in part and vacated in part on other grounds*, 182 F.3d 1319 (Fed. Cir. 1999).

the answer to what was "really going on" at the Department of Education lies with Ms. DeVos. A high-ranking official's "personal knowledge of the issues being litigated" is key to the question of whether extraordinary circumstances are present. *Gray v. Kohl*, No. 07-10024-CIV, 2008 WL 1803643, at *1 (S.D. Fla. Apr. 21, 2008); *see also Toussie,* 2006 WL 1982687, at *2 (The depositions of former government officials are "[g]enerally…granted where the official has been personally involved in the events at issue in the case"); s*ee also Energy Capital*, 60 Fed. Cl. At 318 ("[It is] clear in the context of deposing former high-ranking government officials…that depositions are allowed if the party has personal knowledge of the facts in issue.").

Personal knowledge exists where an official is responsible for "maintaining, promulgating, and implementing" the policy at issue.  *Smith v. City of Stockton*, 2017 WL 11435161, at *4 (E.D. Cal. Mar. 27, 2017) (emphasis removed) (declining to find that apex doctrine bars deposition of Chief of Police where Plaintiffs' allegations "addressed his own implementation (or failure to implement) a policy regarding use of force"); *see also Lederman*, 731 F.3d at 203 .

Ms. DeVos was "personally involved in the events at issue in the case," *see Karnoski v. Trump*, No. C17-1297 MJP, 2020 WL 5231313, at *4 (W.D. Wash. Sept. 2, 2020) (permitting deposition of former member of Joint Chiefs of Staff). Specifically, Ms. DeVos has unique first-hand knowledge regarding the reasons put forth for ED's decision to delay the processing of borrower defense applications, and ED's "false restart" of the borrower defense process using defective form denial notices.

### i.   The Reasoning for the Delay Order

One of Plaintiffs' central contentions is that ED operated under a "blanket policy" of refusal to decide borrower defense applications on their merits. For their part, the *Sweet* Defendants have denied the existence of such a blanket policy. *See* Class Certification Order, ECF No. 46 at

7 ("[Defendants] complain that plaintiffs do not allege any facts regarding some explicit order from on high within the Department[.]"). But discovery has borne out that there *was* such a policy, and the *Sweet* Defendants have proffered several dubious ex-ante justifications in the *Sweet* litigation, including the "difficulty of reviewing borrower defense applications" (Discovery Order at 15); the claim that the injunction in the *Calvillo Manriquez* litigation prevented borrower defense applications from being processed; a concern that "if the department issued denials without at the same time issuing approvals, borrowers could be misinformed and believe that we would not be approving any claims, and there was a concern that that would have a chilling effect on borrowers" (Jones Dep. 173:23-174:7); and inadequate staffing.

The *actual* reason for the delay is relevant to the resolution of the *Sweet* case. The parties do not dispute that ED has an obligation to decide borrower defense applications on the merits. And, as the court observed at the time of class certification, "*Here is a fact no one disputes: the Department has decided zero applications since June 2018.*" Certification Order, *Sweet* Matter, ECF No. 46 at 8. Thus, the *Sweet* Defendants must show that their failure is justified. *See Telecomms. Research and Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984).

Other high-ranking deponents have thus far not been able to provide the actual reasons for ED's failure to decide borrower defense claims on the merits, in large part because they have denied the existence of such an order. What they have provided, though, is evidence that their litigation excuses are not in fact the actual reason for ED's delay, and the Secretary DeVos is the only person with authority to make the decision to stop—and start—deciding borrower defense applications on the merits.

### ii.  The *Calvillo Manriquez* Injunction Excuse

When asked to explain why the *Calvillo Manriquez* injunction prevented the adjudication

of borrower defense claims, deponents floundered, demonstrating an understanding of the narrow scope of the injunction, but pointing to decisions made by "others" as to why it had such apparently wide-ranging effects.  The May 2018 injunction in *Calvillo Manriquez v. DeVos* prevented ED from applying the so-called "partial relief" methodology to *Calvillo Manriquez* class members because ED's use of social security data to apply the methodology violated the Privacy Act.  *See* Order, *Calvillo Manriquez, etc. al. v. DeVos, et al.,* No. 17-cv-0 The 7210-SK, ECF. No. 60 (May 25, 2018).  The injunction was actually quite narrow in two respects. First, it applied only to members of the *Calvillo Manriquez* class, who are a subset of borrower defense applicants with certain job placement rate claims who attended certain programs during certain periods of time at schools owned by Corinthian Colleges. Second, the injunction prevented ED from using social security data to determine percentages of relief; using a different formula would have been permissible. *Id.* Despite the narrow scope of this injunction, ED often cited it as the reason for the delay in adjudicating *all* borrower defense claims.  *See, e.g.,* Jones Declaration, *Sweet* Matter (ECF No. 53-2); DeVos Written Testimony before the House Committee on Education and Labor at 6 (Dec. 12, 2019) ("HERC Testimony, attached as Ex. H) ("Unfortunately, in May of 2018, a Federal district court in California determined that the manner in which the Department obtained earnings data from the [SSA]…violates the Privacy Act. We strongly disagree and have been ***waiting for a decision on appeal from the 9th Circuit since filing an appeal over a year ago***. The Department stands ready to process these claims and continues to explore methods for doing so ***as it awaits a decision from the 9th Circuit***.") (emphasis added).

Deponents doubled-down on this false excuse.  For example, Ms. Jones stated: "It's my understanding that the court … enjoined our methodology which at the time relied on earnings data from the Social Security Administration. It is my understanding that the court had concerns

about potential violation of the Privacy Act in using Social Security data for this purpose. …. That particular ruling would have applied to the class of borrowers that we refer to as the Manriquez class. There were a group of borrowers. I do not recall how many." Jones Dep. 94:6-19. However, Ms. Jones also incorrectly stated that the "California courts" prevented applications from being decided because ED was "not *able* to determine the level of harm or the level of relief that a borrower should get because the methodology we now use is being challenged." *Id.* 115:6-11 (emphasis added). Ms. Jones further stated that though the Borrower Defense Unit was still able to "review evidence, to review claims" despite the injunction, she did not know if that was actually being done. *Id.* 115:15-25; *see also id.* 138:1-9, 173:11-18, 177:4-14. Ms. Jones was unable or unwilling to shed light on why this oft-repeated false claim continued to be peddled. When questioned about who decided to stop issuing denials following the injunction in *Calvillo Manriquez*, the exchange was as follows:

> **Question**: Okay. So what was your understanding of how *Calvillo Manriquez* affected FSA's ability to send out borrower defense decisions?
> **Answer**: What I – what I'm trying to explain to you is that because there was pending litigation, whether a particular decision was related to that litigation or not, because there's pending litigation around borrower defense, I am not *a senior enough official to have decision-making authority*.
> **Question**: What was – so who would have decision-making authority to – if not you?
> **Answer**: I think that's what I'm trying to tell you is that I – I – I – there's lots of people who could have it. I don't know who made all the decisions, but I do know it wasn't me. […]
> **Question**: You were just told of that decision and went along with it…
> **Answer**: I was told that was the decision.

Jones Dep. 182:17-183:5. (emphasis added). Likewise, Mr. Manning did not recall anything about the effect of the *Calvillo Manriquez* injunction, including to which students it applied to, concluding that it "effectively put aside the methodology that we had established." Manning 118:2-4. For her part, Ms. Nevin appeared to understand the narrow scope of the injunction, admitting that it prevented only the "partial relief" methodology, stating accurately, "I don't believe the

injunction precludes [issuing borrower defense claims for 100% relief]. I think it specifically says that the department could, if I'm remembering correctly." Nevin Dep. 149:6-9. But, like all other deponents, Ms. Nevin did not know who made the decision borrower defense decisions would be issued even for borrowers who were not part of the *Calvillo Manriquez* class:

> **Answer**: We did issue decisions between end of 2017 and May of 2018 primarily on Corinthian cases. And then in 2018 to November 2019, I think it was tied to the relief methodology issue and the policy to not issue decisions on denials while they couldn't issue decisions on approvals or felt that they couldn't issue decisions on approvals.
> **Question**: In your view, would it have been possible to issue decisions on approvals in between May 2018 and November 2019?
> **Answer**: Not Corinthian job-placement-rate decisions because of the relief methodology at least under that methodology. ***On the others, like I said, I think it was a policy decision.***

Nevin 223:9-25 (emphasis added). Mr. Brown also stated that the "path going forward" was that no decisions could be issued until a new partial relief methodology was in place.  Brown 111:11-16; *see also* 110:11-17 "[T]he department at that point decided that we would continue the same posture that we were in and not issue notifications but continue to do adjudications until the point at which the methodology was ·completed, and then that – and then we would begin doing both.").

But who drove this policy decision? When asked if Diane Auer Jones made the decision that no borrower defense decisions would be issued while the *Calvillo Manriquez* injunction was in place, Mr. Brown stated that he did not know, but that her office (the Office of the Under Secretary) "would have relayed" the decision to him. Brown 223:5-16.  But the Under Secretary herself said someone more "senior" than her made the decision. Jones Dep. 182:17-183:5. Ms. DeVos, one of only two people more senior than Ms. Jones, has unique firsthand knowledge about this issue.

### iii. The "Chilling Effect" Excuse

Deponents also put forth the theory that a reason for the delay in issuing borrower defense decisions was a concern that "if the department issued denials without at the same time issuing

approvals, borrowers could be misinformed and believe that we would not be approving any claims, and there was a concern that that would have a chilling effect on borrowers. So a decision had been made in – in – that we would not issue denials if we were not also issuing approvals." Jones Dep. 173:23-174:7. But Ms. Jones did not know who made that decision. *Id.* 174:8-11. Ms. Jones also attempted to connect that decision to the *Calvillo Manriquez* injunction, falsely stating that she could not have "reversed" the decision to "not issue denials until approvals could also be issued" because "there was litigation involved." *Id.* 178:1-14. However, Ms. Jones denied any responsibility for this supposed connection between the "chilling effect" excuse and the *Calvillo Manriquez* excuse. When asked "who made the decision not to issue denials until approvals could also be issued?" she responded "I do not know […] I was told that was the decision." Jones Dep. 184:25-185:5. Ms. DeVos, of course, was one of very few people in a position to inform Ms. Jones of decisions.

Mr. Manning confirmed that the "chilling effect" excuse would have been connected to Ms. DeVos even more directly:

> **Question**: I'm just asking the question: One thing that's clear, Mr. Manning, is that of anybody at the Department of Education, Secretary DeVos would have the authority to issue a decision that would require stopping the issuance of borrower defense approvals and denials; is that right?
> **Answer**: I expect the Secretary has that authority and so I would expect that she'd be briefed by others, including general counsel on an issue before an action like that was taken.

Manning, 123:17-124:6. But for his part, Mr. Manning had "no recollection" if he had made "***any*** decision" regarding borrower defense. *Id.* (emphasis added). Similarly, Ms. Jones stated that she had neither personally made any policy decisions about borrower defense besides finalizing the 2019 regulations, nor was she aware of ***any*** policy decisions concerning whether a borrower defense claim should be granted or approved. Jones Dep. 299:21-24.

The notion, then, that no denials should issue until ED granted applications, came from

unknown origin and was conveyed to Ms. Jones and Ms. Nevin.  It is also a patently absurd excuse

for the delay: prior to the litigation, the only grants made by Ms. DeVos were early in her tenure

as Secretary when she discharged the loans of 16,315 borrowers whose claims had been approved

under the previous administration "with extreme displeasure." *See* Manning Dep. at 69:12-70:17.[8]

After that, it appears Ms. DeVos developed a system whereby nearly all claims would be denied.

*See* Discovery Order at 5 (91.5% denial rate). Ms. DeVos thus has personal knowledge about the

veracity of the "chilling effect" excuse.

### iv.  The Staffing Excuse

Ms. DeVos also has direct knowledge about the veracity of the staffing excuse.  Mr. Brown

pointed to staffing as being an issue that caused the delay: "[T]he two things that needed to get

done were more attorneys and more resources in the development of the platform in order to make

the borrower defense process work. Brown Dep. 239:16-20.  Mr. Brown stated that "borrower

defense as a whole was a concern for me when I started in March of 2019" (*Id.* 47:2-4) and that

"through deliberation with the team, I concluded that we needed more people. Specifically, we

needed more attorneys and we needed more financial resources if we were to fix the systems that

– that manage, collect, case management systems that support the team. And, so, as the operating

officer, I went about focusing on – on that and fixed it in the next several months." *Id.* 47:8-16

(clarifying that by "fixed it" he meant "[h]ire attorneys, recruit, hire, bring on board attorneys so

that there would be more hands doing the work." *Id.* 19-21.[9]

---

[8] The necessity of understanding this documentary evidence is light of the statements of deponents
is yet another thumb on the scale of extraordinary circumstances. *See Panagoulakos v. Yazzie*, No.
CIV 11-381 KBM/WDS, 2012 WL 13076527, at *2 (D.N.M. Apr. 13, 2012) (Finding that the
plaintiff made required showing of extraordinary circumstances allowing deposition of Chief of
Police to testify about a quotation of the Chief's in a written report).
[9] Mr. Brown also blamed antiquated IT systems on the delay. Brown Dep. 88:12-20, 91:4-9, 191:8-
23, 239:16-20.

Mr. Brown's hiring efforts to clear the backlog raise a crucial question, of course: If staffing would have cleared the backlog sooner, why were Ms. Nevin's repeated requests for additional attorneys were denied?  She testified that the decision not to hire more attorneys earlier *created* the delay:

> **Question**: So it was about three years, from spring 2017 to spring 2020, that, in your opinion, BDU was not really in a position to make any significant progress on protocols for non-Corinthian schools?
> **Answer**: Yes.
> **Question**: I think I might have asked this before, but just to be clear, do you have any understanding of the reasons why your requests for additional staff were denied after the department-wide hiring freeze ended?
> **Answer**: That's above my pay grade. I don't know.

Nevin Dep.144:22-145:9. As described in the next section, Ms. DeVos took a keen and abrupt personal interest in "clearing the backlog" after the Settlement Agreement, and as such, has unique personal knowledge about ED's decision to hire more attorneys when it did.

### v.  The False Restart

Starting in early 2020—and increasingly after signing the Settlement Agreement, ED began sending "alarmingly curt" denial notices to borrower defense applicants. Discovery Order at 5.  Of course, these notices were universally denials, so the effort to clear the backlog appears to have been nothing more than an effort to issue bulk denials without actually considering the applications on the merits. Ms. DeVos was at the heart of this effort. *See* Nevin Dep. at 101:22–102:1 ("The Secretary set the elimination of the backlog…"); Jones Dep. 128:2-130:16 (the Secretary requested regular updates from Mr. Brown regarding "how many pending claims were there" and "how many claims had been adjudicated").

Ms. DeVos's involvement in the suddenly urgent "backlog" clearing after the Settlement Agreement set an 18-month deadline goes to the heart of what the California court was concerned by when he ordered Discovery: agency pretext.  The *Sweet* Defendants claimed that the difficulty

of reviewing borrower defense applications caused the delay in adjudicating claims, but when they decided to "clear the backlog" at Ms. DeVos's orders, they did so at "breakneck speed" without actually adjudicating claims on the merits. *See* Discovery Order at 5. Then-Secretary DeVos's apparent directive of speed over substance is an appropriate and necessary subject for testimony. *See, e.g.*, *Union Sav. Bank of Patchogue, New York v. Saxon*, 209 F. Supp. 319 (D.D.C 1962) (allowing the deposition of defendant agency head where plaintiff alleged "actions personal to the Defendant and in violation of the United States Code.").

### b.  This Information Is Not Available From Other Sources.

Plaintiffs have diligently pursued the limited discovery permitted by the California court's order and ED's witnesses have been unable to answer basic questions central to the allegations in this matter or to explain the many pretextual arguments proffered by ED before discovery was ordered.  Rather, all signs point to Ms. DeVos as the last possible source of this information.[10]

A deposition of a high-ranking official may be permissible when the information "cannot be obtained from other sources" where it takes "reasonable measures to obtain the necessary information." *Odom v. Roberts*, No. 5:19-cv-253-MCR/MJF, 2020 WL 7111175, at *5 (N.D. Fla. Dec. 1, 2020).  In particular, "the exhaustion of less intrusive means" is "not an absolute requirement." *Reilly v. Chipotle Mexican Grill, Inc.,* No. 15-civ-23425-COOKE/TORRES, 2016 WL 10644064, at *7 (S.D. Fla. Sept. 26, 2016).  Instead, the exhaustion of other sources is "an important, but not dispositive, consideration" that a court uses in its "discretion" to determine

---

[10] None of the documents produced by the *Sweet* Defendants shed light on the answer to these questions either. As explained above, ED has refused to produce internal Department email regarding the halt to borrower defense decisions, which is the subject of a pending motion to compel in the California court. *See Jackson Mun. Airport*, 2018 WL 3543955, at *3 (allowing the deposition of the Governor's chief of staff, finding that even though the information could be sought from individuals with whom the deponent communicated, plaintiffs "are entitled to discover this information from Governor Bryant's staff member who has personal knowledge on the subject.").

whether a deposition is allowed.  *Id.* (allowing deposition under apex doctrine where deposing party "has been diligent in her discovery obligations… by first deposing" several other witnesses); *see also In re Transpacific Passenger Air Transp. Antitrust Litig.,* 2014 WL 939287, at *1 (N.D. Cal. Mar. 6, 2014) (noting that exhaustion of other discovery routes is an "important consideration" but not a "requirement" for the taking of an apex deposition). Indeed, "[t]here is no absolute requirement that a party exhaust all alternative, less burdensome means of discovery before proceeding with the deposition of a high-ranking government official." *Eng v. County of Los Angeles*, No. CV 05-2686 MMM (SSx), 2007 WL 9729101, at *8 (C.D. Cal. Apr. 5, 2007) (internal quotation marks omitted).

Plaintiffs satisfied these basic obligations before seeking to depose Ms. DeVos.  Though not absolutely required, Plaintiffs in the *Sweet* Matter explored multiple alternative sources for obtaining the information they now seek from Ms. DeVos: depositions of four other senior ED officials, document requests, and interrogatories. None yielded answers to important questions that the California court authorized Plaintiffs to explore via discovery.

The fact that Plaintiffs deposed four senior ED officials instead of five (*see* Motion to Quash at 18) is of no moment. The depositions that Plaintiffs did conduct covered individuals in the relevant decision-making positions during the relevant time period. Ms. DeVos now complains that Plaintiffs did not select a fifth deponent from the *Sweet* Defendants' list of "knowledgeable" individuals in an interrogatory response (*id.*)—without noting that the list failed to include any person's title(s) or dates of service, offered only the vaguest generalizations about each person's purported knowledge, and included a number of individuals who no longer work at ED (one of

whom is deceased).[11] *See* ECF No. 1-6 at 4. Parties are not required to waste time and resources on non-apex depositions when the circumstances justify deposing an individual with personal knowledge of the case. Indeed, it would be a perverse outcome for Plaintiffs to depose any number of *current* ED officials, as Ms. DeVos suggests, merely to avoid imposing upon a private citizen, when in fact no other deponent has knowledge of the facts Plaintiffs seek. *Accord Summerville v. N.J. State Police,* No. 14-7653 (KM), 2018 WL 401785 *3 (D.N.J. Jan. 11, 2018) (ordering deposition of state police colonel where he is "the only one who can testify definitively in this matter regarding his own alleged "failure to act."); *Lull v. County of Sacramento*, No. 2:18-cv-1020-MCE-EFB PS, 2020 WL 4547166, at *2 ("[G]iven plaintiff's contention that Lamera directed Aspesi to create the policy at issue—a contention that Lamera does not dispute—written discovery or deposing lower-level employees is unlikely to be sufficient.").

The case of *Cruz v. Green,* relied upon by Ms. DeVos, actually establishes the propriety of her deposition. No. 18-60995-CIV, 2019 WL 5208913 (S.D. Fla. Feb. 7, 2019). There, the court granted a Motion for Protective Order for a deposition of a former Sheriff of Broward County where the plaintiff had not yet deposed **any** lower-level officials in that office. *Id.* at *4. In so ruling, the court **expressly noted** that the deposition would be permitted "in the event that Plaintiff later can establish that the information he seeks is unavailable from lower-level officials or other sources." *Id*. Here, Plaintiffs have diligently and expediently deposed four ED officials, none of whom have been able to provide information regarding the topics described above. *Cruz* does not stand for the proposition that a plaintiff must utilize every deposition at her disposal before deposition of a former government official is permissible. *See Eng*, 2007 WL 9729101 at *8; *see*

---

[11] The *Sweet* Defendant's list also did not include Mark Brown, who as head of FSA oversees the Borrower Defense Unit—casting additional doubt on the thoroughness and accuracy of this list.

*also St. Fleur v. City of Linden, New Jersey*, No. 15CV01464SRCCLW, 2017 WL 3448106, at *3 (D.N.J. Aug. 10, 2017) ("[A]lthough Defendant contends that several other people are positioned to provide the information sought by Plaintiff, it is plainly more efficient to depose a single principal actor in the form of Defendant."). In fact, by refraining from taking unnecessary depositions, Plaintiffs are conserving resources and ensuring a timely resolution of the case.[12]  As the California court noted in the Discovery Order, "time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm[.]" Discovery Order at 15.

Likewise, Ms. DeVos's accusations regarding interrogatories are unavailing. She accuses Plaintiffs of not using interrogatories, but ignores the relevant interrogatories Plaintiffs did propound, and the fact that the Eleventh Circuit does not require Interrogatories in lieu of depositions. Indeed, the policy argument supporting using interrogatories instead of depositions is based on the interest of not taking up the time of currently serving officials, a point which is now irrelevant as to Ms. DeVos. *See, e.g., Alexander v. FBI*, 186 F.R.D. 1, 5 (D.D.C. 1998); *see also Jackson Mun. Airport Auth. v. Reeves*, No. 3:16-CV-246-CWR-FKB, 2020 WL 5648329, at *5 (S.D. Miss. Sept. 22, 2020) ("This matter is a good candidate for an oral deposition. . . . Songy is no longer in public service, so a deposition will not distract him from official duties.").[13]

---

[12] Further, Ms. DeVos's suggestion that a fifth deponent would have been fruitful contradicts the *Sweet* Defendants' own representations in the California litigation. An attorney declaration recently filed by the *Sweet* Defendants in support of their Opposition to Plaintiffs' Motion to Compel states: "[T]he Department focused its efforts on retrieving documents from the ***four custodians most likely to have responsive documents***: ***Diane Auer Jones***, who was then Acting Under Secretary of ED, ***Colleen Nevin***, Director of the BDU, FSA Chief Operating Officer ***Mark Brown***, and ***James Manning***, formerly Acting FSA Chief Operating Officer. ***To retrieve documents from additional custodians was likely to result in a duplication of the documents retrieved from the four primary custodians***." Opposition to Motion to Compel, Ex. A ¶ 7, *Sweet* Matter, ECF No. 183-1 (emphasis added).

[13] Several court have allowed depositions of officials given "extraordinary circumstances," but tempered the burden to the official by imposing time limits.  Such limitations are not necessary

## B.  Ms. DeVos Improperly Maligns Plaintiffs' Motives.

Ms. DeVos's Motion to Quash proceeds from the assumption that the deposition subpoena constitutes a "transparent attempt at harassment," ECF No. 1 at 25, and reasons from that conclusion. *See also id.* at 1 (describing subpoena as "discovery abuse"); *id.* at 2 ("Plaintiffs appear to be more interested in the deposition itself (and the press attention that might come with it) than in the information they claim to seek."); *id.* at 17 (same).[14] These assertions are unfounded and contradicted by findings already made by the California court, which made clear that although "class counsel may not *yet* depose the Secretary" (emphasis added), extraordinary circumstances could justify the deposition at a later date. Discovery Order at 16. That later date has arrived — not because of improper motives on the part of 160,000 class members who have been "h[u]ng[] out to dry" by ED (*id.* at 15), but because, as Judge Alsup found, "we are faced with a strong showing of agency pretext" and "[w]e need to know what is really going on." *Id.* The court specifically contemplated that Plaintiffs could "seek further depositions, or expansion or extension

---

here because the former Secretary is now a private citizen, but such cases illustrate that the concern about "harassment" is by no means dispositive even if—contrary to the instant case—the concern is reasonable. *See, e.g., Odom*, 2020 WL 7111175, at *4 ("[C]ourts can ameliorate the burden placed on a government official by imposing time limitations and restricting depositions to approved subjects[.]"); *Greater Birmingham Ministries*, 321 F.R.D. at 414 (limiting time and subject matter to "only those topics … Plaintiffs have shown that the Secretary has unique personal knowledge about which Plaintiffs have not already received substantial discovery.").

Further, concerns about "harassment" are present only when the potential deponent lacks personal knowledge—which is, of course, not the case here. *See Reilly*, 2016 WL 10644064, at *7 ("The purpose of the apex doctrine is to prevent the potential harassment and abuse of high level corporate executives *where he or she has little or no knowledge*") (emphasis added).

[14] Ms. DeVos's transparent attempt to cast aspersions on Plaintiffs' motives extends to dissecting the wording of a press release. *See* Motion to Quash at 17 n.10. A press release is, of course, a plain-language summary for purposes of informing the public, and would not generally be expected to include an exegesis of the requirements of the Administrative Procedure Act.

And, it should be noted, this is by no means the first time Ms. DeVos has mischaracterized the very real concerns of *Sweet* Plaintiffs as mere posturing. *See, e.g.,* HERC Testimony at 5 ("Yes, there is a backlog of borrower defense claims at Federal Student Aid. To say that I am frustrated by that backlog is an understatement. But rather than focus on why there is a backlog, too many have instead focused on creating a media circus.").

of discovery via letter brief" (*id.* at 16), which is exactly what Plaintiffs did.

Although Ms. DeVos dismisses Plaintiffs' advocacy as a "PR campaign" (Motion to Quash at 25), the California court, after eighteen months of litigation, stated plainly that this is "not an attorney-driven case. Class members have a genuine interest; they sought opportunity via higher education only to be deceived by for-profit institutions and, at least in some cases, saddled with crushing debt." Discovery Order at 17. Indeed, the court found that it was the former Secretary, not the Plaintiffs, whose actions suggested that she had been proceeding in bad faith: "'[T]he evidence tells a story that does not match the explanation the Secretary gave for h[er] decision.' Judicial review of agencies is deferential — not naïve. Courts will not suffer pretext in the review of agency conduct." *Id.* at 15 (quoting *Dept. of Comm.,* 139 S. Ct. at 2575).

As detailed above and in Plaintiffs' letter to the California court in January, Plaintiffs have shown that Ms. DeVos has unique knowledge about the issues at the heart of this case. Seeking her deposition — precisely as the California court contemplated Plaintiffs might have cause to do after deposing other officials — is not only appropriate, but a necessary step to properly advocate for the interests of the class, who have suffered "shared trauma." Discovery Order at 17. Class members, and the court, "need to know what is really going on" in order to proceed with their claims. *Id.* at 15. Ms. DeVos is the person who can tell them.

## IV.   CONCLUSION

For the foregoing reasons, the *Sweet* Plaintiffs respectfully request that this Court DENY Ms. DeVos's Motion to Quash the Rule 45 Deposition Subpoena.[15]

---

[15] *See supra* at 1. By making this request, Plaintiffs do not waive any arguments made in their Motion to Transfer.

Dated: February 22, 2021                    Respectfully submitted,


                                            */s/ Manuel J. Dominguez*
                                            Margaret E. O'Grady (*pro hac vice*)
                                            Email: mogrady@law.harvard.edu
                                            Rebecca C. Ellis (*pro hac vice*)
                                            Email: rellis@law.harvard.edu
                                            LEGAL SERVICES CENTER OF
                                            HARVARD LAW SCHOOL
                                            122 Boylston Street
                                            Jamaica Plain, MA 02130
                                            Tel.: (617) 390-3003
                                            Fax: (617) 522-0715

                                            Manuel J. Dominguez
                                            FL Bar No.: 0054798
                                            Email:  jdominguez@cohenmilstein.com
                                            COHEN MILSTEIN SELLERS & TOLL
                                            PLLC
                                            11780 U.S. Highway One  | Suite N500
                                            Palm Beach Gardens, FL 33408
                                            Telephone: (561) 515-1400
                                            Facsimile: (561) 515-1401

                                            *Attorneys for Movants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 22, 2021, the foregoing Opposition to Elisabeth DeVos's Motion to Quash and exhibits were served on all parties to this action using the CM/ECF electronic filing system.

*/s/ Manuel J. Dominguez*

Manuel J. Dominguez
