# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - X
THERESA SWEET, et al., on        :
behalf of themselves and all     :
others similarly situated,       :
            Plaintiffs,       :
vs.                              :
ELISABETH DEVOS, in her          :
official capacity as             :
Secretary of the United          :
States Department of             :
Education, et al.,               :
            Defendants.       :
- - - - - - - - - - - - - - - - X

Remote Videotaped Deposition Of DIANE AUER JONES

Friday, November 20, 2020

9:15 a.m. (EST)

Job No. 330599

Pages: 1 - 301

Reported by: Dana C. Ryan, RPR, CRR

Page 2

```
 3              November 20, 2020
 4              9:15 a.m. (EST)


 8        Remote Videotaped Deposition of DIANE AUER
 9    JONES, held via Zoom video teleconference, before
10    Dana C. Ryan, Registered Professional Reporter,
11    Certified Realtime Reporter and Notary Public in
12    and for the State of Maryland.
```

Page 3

```
 1                  A P P E A R A N C E S

 3        ON BEHALF OF THE PLAINTIFFS:
 4            MARGARET O'GRADY, Esquire
 5            EILEEN CONNOR, Esquire
 6            TOBY R. MERRILL, Esquire
 7            R. ELLIS, Esquire
 8            Legal Services Center of
 9               Harvard Law School
10            122 Boylston Street
11            Jamaica Plain, Massachusetts 02130
12            Telephone:  (617) 390-3003
13            Email: mogrady@law.harvard.edu
14            Email: econnor@law.harvard.edu
15            Email: rellis@law.harvard.edu
16            Email: tmerrill@law.harvard.edu

18                   - and -
```

Page 4

```
 1           A P P E A R A N C E S   C O N T I N U E D

 3            JOSEPH JARAMILLO, Esquire
 4            CLAIRE TORCHIANA, Esquire
 5            Housing & Economic Rights Advocates
 6            3950 Broadway, Suite 200
 7            Oakland, California 94611
 8            Telephone:  (510) 271-8443
 9            Email: jjaramillo@heraca.org
10            Email: ctorchiana@heraca.org

12        ON BEHALF OF THE DEFENDANTS:
13            R. CHARLIE MERRITT, Esquire
14            KEVIN P. HANCOCK, Esquire
15            KATHRYN C. DAVIS, Esquire
16            U.S. Department of Justice
17            Civil Division, Federal Programs Branch
18            1100 L Street, Northwest
19            Washington, D.C. 20530
20            Telephone:  (202) 307-0342
21            Email: robert.c.merritt@usdoj.gov
22            Email: kathryn.c.davis@usdoj.gov
23            Email: kevin.p.hancock@usdoj.gov
```

Page 5

```
 1           A P P E A R A N C E S   C O N T I N U E D

 3        Also present:
 4            Dan Macom, Video Technician
 5            Asher Trangle
 6            Matt Pachman
 7            Victoria Roytenberg
 8            Jed Brinton
 9            Andrew Teoh
```

Page 6

```
 1              C O N T E N T S
 2   EXAMINATION OF DIANE AUER JONES:          PAGE:
 3   By Ms. O'Grady                              10
 4
 5
 6
 7                E X H I B I T S
 8         (Attached to the Transcript)
 9   JONES DEPOSITION                          PAGE:
10   Exhibit 1    Revised Notice Of Deposition   13
11   Exhibit 2    Declaration Of Diane Auer      18
12                Jones
13   Exhibit 3    U.S. Department Of Education   48
14                Office Of Inspector General
15                Report
16   Exhibit 4    January 10, 2017 Email         52
17   Exhibit 5    October 24, 2016 Email         57
18   Exhibit 6    January 9, 2017 Email          60
19   Exhibit 7    James 4, 2017 Email            62
20   Exhibit 8    December 14, 2017 Memorandum   64
21   Exhibit 9    Borrower Defense Unit Claims   66
22                Review Protocol
23   Exhibit 10   May 22, 2019 Hearing          111
24                Transcript
25
```

Page 7

```
 1          E X H I B I T S  C O N T I N U E D
 2         (Attached to the Transcript)
 3   JONES DEPOSITION                          PAGE:
 4   Exhibit 11   Document Titled 84 FR         185
 5                49788-01, 2019 WL 4573049
 6                (F.R.) Rules And Regulations
 7                Department Of Education,
 8                34 CFR Parts 668, 682, And
 9                685, RIN 1840-AD26, [Docket
10                ID ED-2018-OPE-0027] Student
11                Assistance General
12                Provisions, Federal Family
13                Education Loan Program, And
14                William D. Ford Federal
15                Direct Loan Program, Monday,
16                September 23, 2019
17   Exhibit 12   April 21, 2019 PowerPoint     186
18                Titled Borrower Defense To
19                Repayment
20   Exhibit 13   Defendants' Response To       196
21                August 31, 2020 Order
22   Exhibit 14   Affidavit Of Daniel Deegan    216
23   Exhibit 15   Declaration Of Eileen Connor  217
24
25
```

Page 8

```
 1         E X H I B I T S  C O N T I N U E D
 2         (Attached to the Transcript)
 3   JONES DEPOSITION                          PAGE:
 4   Exhibit 16   Wall Street Journal Titled    230
 5                Trump Administration Hires
 6                McKinsey To Evaluate
 7                Student-Loan Portfolio
 8   Exhibit 17   Politico Article Titled DeVos 233
 9                Orders Partial Loan Relief
10                For Many Duped Student
11                Borrowers
12   Exhibit 18   October 27, 2020 Oversight    249
13                Committee Press Release
14                Titled New Documents Show
15                Department Of Education Froze
16                Tool To Help Defrauded
17                Student Borrowers
18   Exhibit 19   Defendants' Response Regarding 263
19                The Court's Request At The
20                October 1, 2020 Class Hearing
21   Exhibit 20   Order Denying Class           289
22                Settlement, To Resume
23                Discovery, And To Show Cause
24
25
```

Page 9

```
 1              P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  We're now on the
 3   record.  Participants should be aware that this
 4   proceeding is being recorded and as such all
 5   conversations held will be recorded unless there
 6   is a request and agreement to go off the record.
 7   Private conversations and/or attorney-client
 8   interactions should be held outside the presence
 9   of your remote interface.
10          This is the remote video recorded
11   deposition of Ms. Diane Jones taken today, Friday,
12   November 20th, 2020.  The time is now 14:15 in UTC
13   time.  We're here in the matter of Theresa Sweet
14   versus Elizabeth DeVos.
15          My name is Dan Macom.  I'm the remote
16   video technician on behalf of U.S. Legal Support
17   which is located at 90 Broad Street, New York, New
18   York.  I'm not related to any party in this action
19   nor am I financially interested in its outcome.
20          At this time I'll ask our court
21   reporter Ms. Dana Ryan, on behalf of U.S. Legal
22   Support, to please enter the statement for remote
23   proceedings into the record.
24          THE COURT REPORTER:  The attorneys
25   participating in this deposition acknowledge that
```

Page 94

```
 1   Privacy Act.
 2          So what was your understanding at the
 3   time that you wrote this of what the court in
 4   Calvillo Manriquez prevented the Department of
 5   Education from doing?
 6      A   It's my understanding that the court
 7   prevented the Department of Education, that it
 8   enjoined our methodology which at the time relied
 9   on earnings data from the Social Security
10   Administration.  It is my understanding that the
11   court had concerns about potential violation of
12   the Privacy Act in using Social Security data for
13   this purpose.  And it is my understanding that
14   that methodology was enjoined.
15      Q   And was enjoined as to whom?
16      A   That particular ruling would have
17   applied to the class of borrowers that we refer to
18   as the Manriquez class.  There were a group of
19   borrowers.  I do not recall how many.
20          So the particular ruling was related to
21   those borrowers, but the methodology would have
22   been employed by the department otherwise to --
23   you know, to -- to the larger pool of borrowers.
24      Q   Okay.  So the methodology that you
25   describe in paragraph 15 was not just for those
```

Page 95

```
 1   who attended certain schools operated by
 2   Corinthian, but for all borrowers?
 3      A   So I -- the answer to your question is
 4   I don't know.  It was communicated to me as the
 5   methodology that was developed for Corinthian
 6   borrowers.  I don't know when it was developed
 7   what the intent was for its long-term use.  I -- I
 8   don't know.
 9      Q   What was your -- what was your role
10   regarding this methodology?  What was your
11   involvement?
12          MR. MERRITT:  Objection.  It's
13   ambiguous.
14          BY MS. O'GRADY:
15      Q   In your role, were you tasked with
16   applying -- of setting policy that applied this
17   methodology to step-two determinations?
18      A   Are you asking me about the 2017
19   methodology?
20      Q   I'm asking you about the methodology
21   that you discuss in paragraph 15, which is what
22   was made after the department conducted a thorough
23   review of its existing methods and developed a new
24   methodology for Corinthian students?
25      A   I believe that paragraph 15 refers to
```

Page 96

```
 1   the 2017 methodology.  I had no involvement
 2   whatsoever in its development or application.
 3      Q   So let's go to paragraph 18.  If you
 4   want to just read that out loud for the record?
 5      A   The department appealed the district
 6   court's decision in Manriquez and still waiting
 7   for a decision from the appellate court.  In the
 8   meantime, the department has undertaken
 9   significant efforts to explore and develop an
10   alternative approach for determining the amount of
11   relief to be given not just to Corinthian
12   borrowers, but to all borrowers with approved
13   borrower defense claims.
14      Q   Okay.  So were you involved with the
15   efforts to explore and develop an alternative
16   approach?
17      A   I was.
18      Q   Okay.  And what was the goal of that
19   alternative approach?
20      A   The goal was, you know, should the --
21   should the District Court of Northern California
22   determine that the methodology already in place
23   was one that we could not use but there would be
24   an alternative methodology that we could use for
25   part two, for step two.
```

Page 97

```
 1      Q   And I think my question was were you
 2   involved in developing this.  Did you lead the
 3   development of this effort?
 4      A   It was -- it was a group that was
 5   involved, and I was part of that group.
 6      Q   And who was in that group?
 7      A   That group included myself, Michael
 8   Brickman from my team; Jeff Appel, who was at FSA
 9   and who is sadly now deceased.  Ian Foss, who was
10   at Federal Student Aid.  Then there were others
11   who came in and out of discussions.  We had, you
12   know, representatives from the Office of General
13   Counsel who were involved in some meetings.  You
14   know, there were conversations with our different
15   statistical offices.
16          So other people were brought into the
17   conversation, but I'd say the main working group
18   was, you know, myself, Michael, Jeff Appel, Ian
19   and probably Robin Minor was involved.
20      Q   Did you have regular meetings?
21      A   I can't recall whether it was a
22   regularly scheduled meeting, but we had many
23   meetings.
24      Q   When did this -- when did this effort
25   to explore and develop an alternative approach --
```

Page 114

```
 1   defense claims; correct?
 2       A    Yes, so she's asking me about the
 3   number of claims.
 4       Q    If you want to just read your answer
 5   for the record.
 6       A    (Witness reviews document.)  Okay.
 7       Q    So beginning there, It is a number that
 8   changes from time to time.
 9       A    Oh, you want me to read it out loud?
10       Q    Yes, if you don't mind.
11       A    Okay.  Let me scroll back up.
12            It is a number that changes from time
13   to time.  It is probably in the neighborhood of
14   160,000.  The last official count I got was
15   158,000, so I'm assuming it's somewhere in the
16   name of 160,000 by now.
17       Q    Okay.  And then on the next page, she
18   says -- this is at the top of the page 50 --
19   Ms. Jones, for the record, yes or no, is there
20   currently a policy which restricts the office of
21   Federal Student Aid from adjudicating or
22   processing any borrower defense claims that did
23   not stem from school closure?
24            And there's a little bit of
25   interruption there.  And the bulk of your answer
```

Page 115

```
 1   is then where you begin, There is not a policy
 2   that prevents.
 3            Would you just read that part of your
 4   answer out loud for the record?
 5       A    Sure.
 6            There is not a policy that prevents the
 7   review of claims.  However, we are not able to
 8   determine the level of harm or the level of relief
 9   that a borrower should get because the methodology
10   we use is now being challenged by the California
11   courts, so we continue to process.
12       Q    Okay.  So I want to understand what you
13   mean here by there's not a policy that prevents
14   their view of claims.
15       A    Yes.  There was no policy in place to
16   prevent Colleen Nevin's team from continuing to
17   review evidence, to review claims, to evaluate the
18   merit of an application.
19       Q    And I think you said earlier today that
20   you do not know either way if she and her team
21   were doing that?
22       A    Right.  I mean, I -- you know, I was
23   told on a level that we're continuing to review,
24   but I don't have direct knowledge of that.  I
25   don't supervise her.
```

Page 116

```
 1       Q    Okay.
 2       A    So it was my understanding that they
 3   were continuing to look at evidence, but I don't
 4   have direct knowledge.
 5       Q    And of the pending claims that you've
 6   stated were in the neighborhood of 160,000, what
 7   schools do those 160,000 borrowers attend?
 8            MR. MERRITT:  Objection.  It's
 9   overbroad.
10       BY MS. O'GRADY:
11       Q    Are they all CCI?
12       A    I -- I would have to go back and look,
13   but I -- no.  I don't know what percentage of them
14   were CCI, but, no, by this point in time, there
15   were claims from -- from, you know, a list of
16   institutions.
17       Q    Okay.  So I -- I guess I'm still trying
18   to understand why the injunction in the Calvillo
19   Manriquez matter would have prevented step-one and
20   step-two determinations from those who did not
21   attend CCI schools?
22       A    I don't think I've ever suggested that
23   step one stop.  I don't know.  I'm not involved in
24   step one.  I was told it continued, but I don't
25   have direct knowledge.  So I can't tell you for
```

Page 117

```
 1   certain whether it did or it didn't, but there was
 2   certainly no policy to stop step one.
 3       Q    Okay.  Assuming step one had continued,
 4   what was preventing the department from doing step
 5   two for non-CCI students?
 6       A    A lack of a methodology to do step two.
 7       Q    And what is the reason for the lack of
 8   a methodology at this point?
 9       A    Because the Northern District of
10   California had determined that our methodology
11   potentially involved a Privacy Act violation.
12       Q    So at the point of the injunction of
13   Calvillo Manriquez, was it Ed's intention to use
14   that partial relief methodology for all pending
15   borrower defense claims step-two determinations?
16       A    I don't know what the intent was of the
17   2017 methodology at the time.
18       Q    Here, you testified that there could be
19   no step-two determinations because of the
20   injunction, and --
21       A    Correct.
22       Q    -- those 160,000 borrowers are not only
23   CCI graduates.  So in effect, that methodology
24   being enjoined prevented all step-two
25   determinations; is that right?
```

Page 126

1  thought about or had any concerns about, or did
2  you -- it didn't occur to you that that would be a
3  problem?
4          MR. MERRITT:  Objection as calling for
5  privileged information.
6          MS. O'GRADY:  It's calling for
7  privileged information in that -- on what basis
8  are you making that objection?
9          MR. MERRITT:  Her thoughts and opinions
10 on decision department policy at the time before
11 final policy was established.
12         MS. O'GRADY:  So you're saying it's a
13 deliberative process privilege whether or not she
14 was concerned about any decisions going out or
15 not?
16         MR. MERRITT:  Yes.
17      BY MS. O'GRADY:
18      Q   Ms. Jones, in your role did you have
19 authority to ask FSA to make decisions on the
20 merits -- to make step-one decisions?
21      A   Could you -- meaning?
22      Q   Well, we've -- we've talked about how
23 you don't -- your role as -- your policy role did
24 not involve step-one decisions.  We talked a lot
25 about that before break.

Page 127

1          I'm wondering if you had the authority
2  to say to Ms. Nevin or whoever else in her role
3  the pace of step-one decisions needs to be
4  increased, for example.  You know, was that within
5  your authority?
6       A   So it sounds to me like you're asking a
7  couple of different things.  It started to sound
8  like you were asking me do I have the authority to
9  tell them to make decisions, but then later --
10 later it sounded like you were asking me if I have
11 authority to establish a pace.
12      Q   So let's take both questions then.  So
13 do you have authority to tell them to make
14 decisions and to send borrower -- borrower defense
15 decisions?
16      A   No.
17      Q   Do you have authority to tell them the
18 pace that they should be working at to process
19 borrower defense decisions?
20      A   I don't have the authority to tell them
21 the pace.
22      Q   Did you ever discuss the pace with
23 Ms. Nevin?
24      A   I discussed the case with Mark Brown.
25 I don't recall whether or not I discussed the pace

Page 128

1  with Colleen.
2       Q   And when did you discuss the pace with
3  Mr. Brown?
4       A   I believe -- I believe that after the
5  methodology was approved, the secretary wanted
6  regular updates on -- you know, on -- on how
7  things were moving, and so --
8       Q   And are you talking about -- which
9  methodology are you talking about?
10      A   The 20- -- I guess we'll call it the
11 2019 methodology.
12      Q   So the 2019 partial relief methodology?
13      A   Correct.  Once that had been approved
14 and -- to say, you know, had -- had been told to
15 apply that methodology, you know, she wanted
16 regular updates on -- on -- you know, on how that
17 was going.  And so, yes, in that context, you
18 know, I get regular updates from her and we
19 discussed --
20      Q   And regular updates, what kind of
21 information did that include?
22      A   Generally it included how many pending
23 claims were there.  Sometimes he would give
24 updates on how many new claims had come in, and at
25 some point he would report on, excuse me, how many

Page 129

1  claims had been adjudicated, and by adjudication
2  meaning how many claims had the attorneys reviewed
3  for a determination on the merit, et cetera.
4       Q   Okay.  So how many step-one
5  determinations had been made as opposed to step
6  two was included?
7       A   Correct.  Now, there was a separate
8  number for -- for, you know, processing, and I
9  can't remember at what point that got added to the
10 update, but at some point in time we also added to
11 the reports, you know, the number of borrowers who
12 had received their notification, but I just can't
13 remember when that got added.
14      Q   And these were sent by Mark Brown to
15 the secretary?
16      A   Some were sent from Mark Brown to me
17 and then they were regularly also sent to the
18 leadership team.
19      Q   And how regularly were these sent?
20      A   I can't remember if it was weekly or
21 biweekly.  I just can't remember.  I think it was
22 biweekly, but it may have been weekly.
23      Q   And were these, like, written memos, or
24 were they PowerPoints?
25          What format did they take?

Page 130

1    A    Generally it was an email. There may
2    have at times been an attachment with a table, but
3    I think generally it was an email, and -- and then
4    ultimately I believe that the data warehouse at
5    FSA added this as a public feature. I believe
6    these data were then posted for public knowledge
7    on the data warehouse.
8    Q    Okay. And when were these updates --
9    when did they start getting sent?
10   A    I don't remember the exact date, but
11   I -- I recall that it was after the December 2019
12   implementation of the new methodology. So there
13   may have been, you know, earlier updates from time
14   to time on total numbers, but the regular updates
15   were after the methodology had been approved and
16   implemented.
17   Q    And how were the metrics used?
18   A    What do you mean by "how were the
19   metrics used"?
20   Q    The information was reviewed by the
21   secretary. What is your understanding of its
22   purpose? Was the -- I'll ask that question. If
23   you need clarification, I can add.
24   A    I mean, I think the purpose was
25   twofold. You know, general information.

Page 131

1    Obviously, a policy decision had been made and
2    people wanted to know if the process was moving.
3         I believe that there -- there was a
4    significant amount of hiring as well, and I think
5    part of that was to, you know, evaluate, you know,
6    the size of the team, you know, do you need more
7    people; do you need fewer people.
8         I'm not involved in personnel
9    decisions, but, you know, I think part of that was
10   also, you know, viewed by people to see if the
11   team was large enough. I mean, the team expanded
12   significantly during this time period.
13   Q    So you said at the start of that answer
14   that people wanted to know the process was moving.
15   What do you mean by that?
16   A    At a general level, you know, it's one
17   thing to develop a policy, and it's another to
18   make sure that those implementing it can do so.
19        And, so, I think there was interest in
20   making sure that it was a policy that -- you know,
21   that operationally could be implemented.
22   Q    Prior to the -- prior to this time,
23   around December 2019, when these -- when the
24   partial relief methodology went into effect, had
25   there been updates about progress or lack thereof?

Page 132

1    A    I believe at that time the updates were
2    about total number of claims. What I don't recall
3    is whether or not those updates included numbers
4    on adjudications. I just can't remember whether
5    they were included at that time. I just -- I -- I
6    can't remember.
7    Q    So you don't remember if updates had
8    included whether or not any claims -- any
9    decisions on the merits had been communicated to
10   students?
11   A    I -- I -- you know, I just can't
12   remember the specific, you know, updates that came
13   through. You know, I just can't remember.
14   Q    But at that point before the 2019
15   regulations were in effect and these updates
16   began, had you talked to anyone about the delay?
17   A    What do you mean by "talked to anyone
18   about the delay"?
19   Q    You know, were there any meetings or
20   conversations you had about the fact that
21   decisions were not being sent out?
22   A    Well, when I came into my role, you
23   know, the -- the decision had been made that
24   because the Northern District of California had
25   concerns about the Privacy Act that we could not

Page 133

1    apply that methodology; that we had to wait and
2    find out whether or not it was going to be deemed
3    that the use of Social Security Administration
4    data was a violation of the Privacy Act.
5    Q    While you were waiting, were -- was
6    another method being developed?
7    A    I started developing the team -- you
8    know, I pulled together the team and we started
9    working on that methodology in, you know, I think,
10   that April, May, June time frame of 2019.
11   Q    I want to go back to the memos that
12   updated the secretary on the progress. Do you
13   know if those metrics were ever used to determine
14   anyone's bonus?
15   A    I'm not involved in the determination
16   of anyone's bonus, so I don't know.
17   Q    Do you know if those metrics were used
18   to determine anyone's job performance rating or
19   job performance review?
20        MR. MERRITT: Objection to the scope of
21   these questions.
22        BY MS. O'GRADY:
23   Q    Ms. Jones, I think you can still
24   answer.
25        MR. MERRITT: Go ahead.

Page 174

1  borrowers could be misinformed and believe that we
2  would not be approving any claims, and there was a
3  concern that that would have a chilling effect on
4  borrowers.
5       So a decision had been made in -- in --
6  that we would not issue denials if we were not
7  also issuing approvals.
8       Q    Who made that decision?
9       A    I do not know.  I was in meetings about
10 that, but I don't -- I can't tell you who actually
11 made that decision.
12      Q    You don't remember?
13      A    I don't even know if I was in a meeting
14 where the final decision was made.  That
15 decision -- you know, I -- I think the original
16 decision was made before I was in my role.  I
17 think it was revisited from time to time, but I
18 don't believe I was involved in the -- in the
19 making of that initial decision.
20      Q    Uh-huh.
21      A    I don't recall.
22      Q    And your understanding, you said, was
23 that you didn't want to have a chilling effect on
24 borrowers.  What do you mean by that?
25      A    I think the concern was that if the

Page 175

1  only decisions being issued were denials, that
2  that could be misreported by the media to make
3  borrowers believe that we were not going to
4  approve valid claims and the chilling effect would
5  be that, you know, if somebody has a valid claim,
6  they could have been discouraged from filing them.
7       We did not want -- I mean, you know, at
8  no point in time did anybody want somebody with a
9  valid claim to not submit it.
10      Q    And whether or not a claim is valid is
11 a step-one determination after they apply;
12 correct?
13      A    That's correct.
14      Q    So -- so it was determined as a matter
15 of policy that it was better to issue no decisions
16 rather than deny -- rather than send out denials
17 of any claims?
18      A    I -- I believe that's the decision that
19 was made in spring of 2018.
20      Q    Was there ever a discussion about
21 sending out approvals so that -- I mean, it seems
22 to me the choice was to either not issue denials,
23 as it says here, until approvals could be issued.
24      Was there a discussion about increasing
25 the pacing of approvals so that you wouldn't have

Page 176

1  to decide between no decisions or just denials?
2       MR. MERRITT:  Objection: calling for
3  privileged information about the deliberations
4  leading to the decision to not do denials.
5       BY MS. O'GRADY:
6       Q    I can move on.  You don't have to
7  answer that.
8       Okay.  Next bullet point is, No
9  processing systems available from summer 2018 to
10 present due to platform development and migration.
11      Now, what is that referring to?
12      A    I believe that was referring to the
13 development of a system to replace Excel
14 spreadsheets as the BD unit's mechanism for
15 managing claims.
16      Q    So when the processing systems were
17 unavailable, were claims still being adjudicated?
18      A    I don't know.
19      Q    Would Colleen Nevin know?
20      A    Yes, I believe she would be the one to
21 know.
22      Q    Okay.  Then issuance of decide --
23 denial note -- excuse me.
24      Issuance of denial decision scheduled
25 to resume by mid September.  What is that

Page 177

1  referring to?
2       A    I didn't write this slide, and so I'm
3  not quite sure what -- what this refers to.
4       Q    So at this point in your role, were you
5  not keeping tabs on the pace of decisions being
6  made?
7       A    In -- in the August time frame, we were
8  still waiting for the California court to rule on
9  the methodology, and so at this point in time, we
10 were still hopeful that there would be a
11 determination, at least for the Corinthian
12 borrowers, about a methodology.  So at -- at this
13 point in time, we're still waiting for the court.
14      Now, by August, we, the working group,
15 had come up with some potential methods to use for
16 adjudicating future claims, but it had not yet
17 been approved.
18      So I think --
19      Q    Okay.
20      A    You know, this may -- whoops, I'm
21 sorry.  This is the time period where we had
22 developed some options.  They weren't yet applied.
23 And in the meantime, there was still the hope that
24 the California court would rule at least for the
25 Corinthian borrowers.

Page 178

1   Q   Regarding the policy decision in spring
2   2018 not to issue denials until approvals could
3   also be issued, I understand that you didn't
4   initially make that decision because it was before
5   your time?
6   A   Right.
7   Q   Could you have reversed it?
8   A   No.
9   Q   Why not?
10  A   Because now there's litigation
11  involved.
12  Q   Say there wasn't litigation involved.
13  A   Yeah, you're asking me to speculate on
14  the circumstance.
15  Q   Well, I guess -- so the decision not to
16  issue any denials until approvals could also be
17  issued, that's actually not related to litigation;
18  right?
19      That was a decision you said made
20  because you didn't want to give borrowers the
21  wrong idea; right?
22  A   Correct.  Initially, but I think the
23  department position was they didn't want to give
24  borrowers the wrong idea.
25  Q   So that decision?  Could you reverse

Page 179

1   that decision?
2   A   So, I mean, you're asking me to tell
3   you what I think might have happened had the world
4   been different and we had --
5   Q   No, no, no.  In the exact world the way
6   it is, if you had wanted to, could you have said,
7   everybody, we're going to send out those denials
8   even though we're not sending out any grants?
9   A   No.
10  Q   Why not?
11  A   Because now that there is litigation
12  involved --
13  Q   But the denials, there's no litigation.
14  They've been denied.  There's no partial relief at
15  issue.  They're waiting there.  They've been
16  denied.  They're ready to go out.
17      There's a policy decision not to send
18  them out because we don't want to spook borrowers
19  and have them think everything is being denied, I
20  have that right; right?
21  A   Yes.
22  Q   So could you have said, we're not doing
23  that; we're going to send out these details?
24  A   No, I could not have done that.
25  Q   Why?

Page 180

1   A   That's what I'm trying to tell you.
2   Because there's litigation involved.  Even if
3   litigation didn't involve denials, there's now
4   litigation around borrower defense.  So I'm not --
5   I'm not a lawyer and I --
6   Q   What litigation?  Are you talking about
7   something different than Calvillo, the Calvillo
8   Manriquez case?
9   A   No.  At this point, Manriquez was the
10  litigation we were waiting.  Yeah, I mean, that --
11  Q   So Calvillo Manriquez, though, was
12  about applying a certain partial relief
13  methodology that violated the Privacy Act.
14      These denials are totally separate.
15  These are not -- they have nothing to do with that
16  partial relief methodology.
17  A   What I'm saying is I'm not an attorney.
18  I'm not involved in that case.  I don't know what
19  the court said.  I don't know --
20  Q   So it would -- so you thought the
21  Calvillo Manriquez injunction meant that no
22  decisions could be issued at all, denial or
23  grants?
24  A   No, I'm saying that once litigation was
25  involved, those decisions were out of my hands.

Page 181

1   Q   In whose hands were they put?
2   A   It would have been a group decision.
3   Q   By who?
4   A   It would have involved input from, you
5   know, our attorneys.  It would have involved input
6   from Office of the Secretary.  You know, FSA and I
7   would have had, you know, a seat at the table.
8       But I --
9   Q   I really want to understand --
10      MR. MERRITT:  Maggie, would you mind if
11  we took a short break right now?
12      MS. O'GRADY:  Can I just finish --
13      MS. BERMAN:  Yeah.  You can do a
14  question or two more.  I was just thinking we've
15  been going for --
16      MS. O'GRADY:  Sure.  I'm almost done
17  with this --
18      MS. BERMAN:  We've been going for more
19  than an hour and a half now.
20      MS. O'GRADY:  Can I just finish this
21  exhibit?
22      MR. MERRITT:  Yeah.  Is it a lot more
23  questions?
24      MS. O'GRADY:  No.  I really want to pin
25  this down and I think there's just a couple of

Page 182

1  more questions, yeah.
2       MR. MERRITT:  Okay.
3       BY MS. O'GRADY:
4       Q    So I just -- it sounds to me, and
5  correct me if I'm wrong -- I really want to
6  understand -- that your position, your
7  understanding of the state of things at this point
8  was that the injunction in Calvillo Manriquez
9  prevented FSA from issuing any borrower defense
10 decisions?
11      MR. MERRITT:  Objection.  It's a
12 mischaracterization of her testimony.
13      BY MS. O'GRADY:
14      Q    Okay.  Please -- please correct me if I
15 misstated that.
16      A    You misstated that.
17      Q    Okay.  So what was your understanding
18 of how Calvillo Manriquez affected FSA's ability
19 to send out borrower defense decisions?
20      A    What I -- what I'm trying to explain to
21 you is that because there was pending litigation,
22 whether a particular decision was related to that
23 litigation or not, because there's pending
24 litigation around borrower defense, I am not a
25 senior enough official to have decision-making

Page 183

1  authority.
2       Q    What was -- so who would have
3  decision-making authority to -- if not you?
4       A    I think that's what I'm trying to tell
5  you is that I -- I -- I -- there's lots of people
6  who could have it.  I don't know who made all the
7  decisions, but I do know it wasn't me.
8       Q    The policy decision not to issue
9  denials until approvals could also be issued, is
10 it your understanding that began immediately with
11 the Calvillo injunction?
12      A    I don't know the precise timing.
13      Q    Okay.  Because I -- so -- and I really
14 want to get to the bottom of this.  I didn't think
15 they were related because I'm reading this bullet
16 point and you explained that it was about not
17 wanting to give borrowers the wrong idea.  And
18 then we have the Calvillo Manriquez injunction
19 that prevents the application of a certain partial
20 methodology towards a number of CCI students.
21          So -- so the approvals have been paused
22 because the approvals demand -- you know, the
23 approvals need that step-two determination of the
24 partial relief that's been enjoined, but the
25 denials don't need to involve step two, and if

Page 184

1  there's denials ready to go out, why couldn't they
2  have gone out?
3       MR. MERRITT:  Objection: asked and
4  answered.
5       MS. O'GRADY:  It has indeed been asked.
6       MR. MERRITT:  And it's been answered.
7       BY MS. O'GRADY:
8       Q    Okay.  I'll ask again.  So you said you
9  could not have reversed that decision because of
10 the litigation?
11      A    That's not exactly what I said.
12      Q    Okay.  And I -- I apologize.  I know
13 this is getting redundant and back and forth and I
14 really just want to make it clear.  I don't mean
15 to -- to be -- to be so repetitive.
16          I really do want to understand is there
17 a person or a number of people, and can you
18 identify them, who could have decided to begin
19 issuing those denials rather than deciding not to
20 issue them until approvals could also be issued?
21      A    It would be speculative, right.  I
22 mean, there are any number of people, but because
23 I don't believe exactly who made each decision, it
24 would be speculative on my part.
25      Q    So who made the decision not to issue

Page 185

1  denials until approvals could also be issued?
2       A    I do not know.
3       Q    You were just told of that decision and
4  went along with it.  Okay.
5       A    I was told that was the decision.
6       MS. O'GRADY:  Okay.  I think we'll take
7  a break now.  Thank you for those extra few
8  minutes.
9       THE WITNESS:  Uh-huh.
10      MS. O'GRADY:  How long do we want the
11 break to be?  Charlie --
12      THE VIDEOGRAPHER:  Hold on one second.
13 The time is 19:24 UTC time.
14          (Recess -- 2:24 p.m.)
15          (After recess -- 2:43 p.m.)
16      THE VIDEOGRAPHER:  Okay.  We're now
17 back on the record.  The time is 19:43 UTC time.
18      MS. O'GRADY:  For the record, I'm just
19 going to state the designations on the last two
20 exhibits.  So file name ECF NO 56-3, Exhibit 5,
21 2019 regulations which is a long PDF file is
22 Exhibit 11.
23          (Jones Deposition Exhibit 11 was marked
24 for identification and attached to the
25 transcript.)

Page 298

1  I don't know who gave the direction. Certainly it
2  wasn't Mark Brown. He wasn't there then.
3    Q   But they carried out the direction?
4    A   Correct.
5    Q   Correct. Okay.
6        And my apologies for the redundancy
7  here. I just want to go back to the development
8  and use of those form denial letters, and those
9  are the form denial letters A through D that we've
10 been discussing that you reviewed.
11       Who else was involved in their
12 development?
13   A   I think I mentioned this earlier. So I
14 think -- I'm trying to picture the people around
15 the table.
16   Q   Ms. Jones, I think you did testify to
17 that, and I'm sure it's on the record. You don't
18 need to repeat yourself there. I think we have
19 that. Okay.
20       Just give me one moment.
21       MR. MERRITT: I just want to make one
22 quick point about to the -- you mentioned keeping
23 this deposition open because of potential
24 documents coming in, just to state for the record,
25 plaintiffs submitted document requests two weeks

Page 299

1  ago on November 6, so the responses to that, you
2  know, aren't due and there would have been no
3  obligation to produce any documents before this
4  deposition. So, you know, you've had -- you've
5  had seven hours today.
6    BY MS. O'GRADY:
7    Q   I just -- Ms. Jones, I have one last
8  point that I wanted to address. We've talked a
9  lot today about the policy decisions or lack
10 thereof around borrower defense.
11       In your time at the Department of Ed,
12 have -- would you say there have been policy
13 decisions made regarding borrower defense?
14   A   We finalized the 2019 regulation. It
15 would be hard to say that's not a policy decision.
16   Q   Besides that.
17   A   Sure. There have been policy decisions
18 about the new methodology, the 2019 methodology,
19 the development of the -- I mean, the methodology
20 is a methodology. That's the policy.
21   Q   Okay. And in terms of granting or
22 denying borrower defense, have there been any --
23 step one, have there been any policy decisions?
24   A   Not to my knowledge.
25       MS. O'GRADY: Okay. I think we're

Page 300

1  done.
2        THE VIDEOGRAPHER: Okay. Shall we
3  close out the record? No cross?
4        THE WITNESS: I think the court
5  reporter wanted me to stay on to give her some
6  spellings.
7        THE VIDEOGRAPHER: Yeah. I'll just
8  close out the video record.
9        MR. MERRITT: Yeah. No cross.
10       THE VIDEOGRAPHER: Okay. We're now
11 going off the record. The time is 22:41 UTC time.
12 This concludes today's testimony given by
13 Ms. Diane Jones.
14       Thank you, and have a great weekend.

18       (Whereupon, the Remote Videotaped
19 Deposition of DIANE AUER JONES ended at
20 5:41 p.m. EST)

Page 301

2                REPORTER'S CERTIFICATE
3  I, Dana C. Ryan, Certified Shorthand Reporter in
4  and for the State of Maryland, hereby certify that
5  the deponent was by me first duly sworn and the
6  foregoing testimony was reported by me and was
7  thereafter transcribed with computer-aided
8  transcription; that the foregoing is a full,
9  complete, and true record, to the best of my
10 ability, of said proceedings.
11 I further certify that I am not of counsel or
12 attorney for either or any of the parties in the
13 foregoing proceedings and caption named or in any
14 way interested in the outcome of the cause in said
15 caption.
16 The dismantling, unsealing, or unbinding of the
17 original transcript will render the reporter's
18 certificate null and void.
19 In witness whereof, I have hereunto set my hand
20 this day: November 24, 2020.
21 _____ Reading and Signing was requested.
22 _____ Reading and Signing was waived.
23 __X__ Reading and Signing was not requested.
24 _____
25 Dana C. Ryan, RPR, CRR